**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JAMES WEBB, JWEBB INSURANCE AGENCY, INC., KIMBERLY WEBB,** and **WEBB INSURANCE AGENCY, LLC,** | Civil Action No.:22-cv-2812 |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| **ALLSTATE INSURANCE COMPANY,** | |
| Defendant. | |

**COMPLAINT FOR MONETARY AND DECLARATORY RELIEF**

**Introduction**

1.      For decades, Defendant Allstate employed local sales agents, like Plaintiffs, as independent contractors to sell private passenger auto and homeowners insurance at brick-and-mortar locations in neighborhoods all across America.  But in July 2020, Defendant Allstate unjustly terminated Plaintiffs' agency agreements[1] for "cause" by baselessly claiming Plaintiffs engaged in "fraud," when, in fact, Plaintiffs were terminated for engaging in conduct that Defendant Allstate had previously approved. Ultimately, Defendant Allstate terminated Plaintiffs' contracts per a restructuring plan called "Transformative Growth," designed to make Allstate into what CEO Tom Wilson recently described as "a low-cost digital insurer."[2]

---

[1] The contractual documents referenced in this Complaint are not attached, but they are currently within the possession and control of Defendant Allstate.
[2] Tom Wilson, presentation materials, Bank of America 2022 Insurance Conference: February 15, 2022.

2.      Plaintiffs were damaged by Defendant's repudiation of the independent contractor agreements here as follows: loss of income, loss of future income, loss of market value of the sale of the agencies, extreme emotional distress, anguish, humiliation, and suffering.

3.      But for Defendant Allstate's wrongdoing, as detailed below, Plaintiffs would have continued to own and operate their Allstate insurance agencies into the foreseeable future and would have enjoyed the income that their economic interest in those agencies was generating, thus Plaintiffs suffered economic harm of not less than $5,000,000.00.

## Jurisdiction and Venue

4.      All preceding paragraphs are incorporated as if fully restated herein.

5.      This action arises under the common law of the State of Illinois to redress contractual rights. Illinois law applies here because the contract in question has no choice of law provision and Defendant Allstate has its corporate headquarters and principal place of business in the State of Illinois.

6.      This Court has original subject matter jurisdiction under 28 U.S.C. § 1332(a) because the matter is between citizens of different States and the matter in controversy exceeds $75,000.

7.      This Court has the authority to provide declaratory relief under 28 U.S.C. §§ 2201 and 2202 and under Rule 57 of the Federal Rules of Civil Procedure.

8.      This Court has personal jurisdiction over Defendant Allstate because it is a corporation domiciled in the State of Illinois or it has otherwise made and established contacts within the State to permit the exercise of personal jurisdiction over it.

9.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant resides in this district and is subject to this Court's personal jurisdiction under 28 U.S.C. § 1391(c)(1).

10.     Further, Defendant resides in Cook County, so venue is proper in this division of this district.

## Parties

11.     All preceding paragraphs are incorporated as if fully restated herein.

12.     Defendant Allstate is a corporation for profit with headquarters in Northbrook, Illinois and having for its address 2775 Sanders Road Northbrook, IL 60062.

13.     Defendant Allstate Insurance Company is incorporated in the State of Illinois and maintains its principal place of business in the State of Illinois. It is a citizen of the State of Illinois pursuant to 28 U.S.C. § 1332.

14.     Plaintiff James Webb is a natural person and resident of Montgomery County, Texas.

15.     Plaintiff Kimberly Webb is a natural person and resident of Montgomery County, Texas.

16.     Plaintiffs James Webb and Kimberly Webb have been married since December 1993.

17.     Plaintiff JWebb Insurance Agency, Inc. is a corporation incorporated in the State of Texas under Schedule C of the IRS tax code, is engaged in the business of insurance sales, and is a resident of Montgomery County, Texas.

18.     Plaintiffs James Webb and Kimberly Webb are 50-50 owners of Plaintiff JWebb Insurance Agency, Inc.

19.     Plaintiff Webb Insurance Agency, LLC is a limited liability company organized under the laws of the State of Texas, is engaged in the business of insurance sales, and is a resident of Montgomery County, Texas.

20.     Plaintiffs James Webb and Kimberly Webb are 50-50 owners of Webb Insurance Agency, LLC.

**Factual Allegations**

21.     All preceding paragraphs are incorporated as if fully restated herein.

22.     October 1, 2013, Plaintiffs purchased a pre-existing Allstate Exclusive Agency located at 11300 West Road, Suite K, Houston, Texas 77065, and moved it ultimately to 17774 Cypress Rosehill, Ste. 800, Cypress TX, 77429, executed a R3001C Agreement with Defendant Allstate on behalf of Plaintiff Webb LLC, and opened the agency.

23.     September 1, 2015, Plaintiffs purchased a pre-existing Allstate Exclusive Agency located at 17920 Huffmeister Rd. Ste 220, Cypress, TX 77429, executed a R3001C Agreement with Defendant Allstate on behalf of Plaintiff Webb Inc, and opened the agency.

24.     Defendant Allstate drafted the R3001C Agreements referenced above.

25.     Under the R3001C Agreements here, there is one Key Person associated with the particular entity (one employer tax identification number) and that person is the agent; the Key Person is the one who executes the agreement.

26.     The aforementioned R3001C Agreement between Defendant Allstate and Plaintiff Webb Inc. identifies Plaintiff James Webb as the Key Person.

27.     The aforementioned R3001C Agreement between Defendant Allstate and Plaintiff Webb LLC identifies Plaintiff Kimberly Webb as the Key Person.

28.     Contemporaneous with the execution of the R3001C Agreements in this case, Defendant Allstate knew and approved of the 50-50 joint ownership that Plaintiffs James and Kimberly Webb enjoyed in JWebb Insurance Agency, Inc. and Webb Insurance Agency, LLC.

29.     Plaintiff JWebb Insurance Agency, Inc. is referred to as "Plaintiff Webb Inc."

30.     Plaintiff Webb Insurance Agency, LLC is referred to as "Plaintiff Webb LLC."

31.     Plaintiffs were Allstate Exclusive Agents.

32.     Allstate Exclusive Agents ("EA(s)") are independent contractors of Defendant Allstate who are authorized to sell insurance policies on behalf of Defendant Allstate in exchange for commission and building a valuable book of business.

33.     In order to become an EA with Allstate, all prospective EAs must enter into the R3001 (S or C) Exclusive Agency Agreement with Defendant Allstate.

34.      The R3001C Exclusive Agency Agreements at issue in this case references and incorporates additional documents (collectively, "EA Agreement"), at ¶ I.C. of the R3001 Exclusive Agency Agreement, as follows: the Exclusive Agency Independent Contractor Manual; the Supplement for the R3001Agreement; and the Allstate Agency Standards.

35.     The executed EA Agreement between Allstate and an EA forms a valid contract under the laws of the State of Illinois.

36.     Per Section I.E. of the R3001 Agreement, EAs are not permitted to sell insurance policies from other insurance companies.

37.     When an EA sells an Allstate insurance policy, the value of that policy becomes part of the EAs "book of business."

38.     The express terms of the EA Agreement establish that Exclusive Agents have an economic interest in the book of business created by the Independent Contractor relationship with Allstate, based on the EA Agreement; and an EA's economic interest includes the ability to sell, or transfer, their interest as provided in the EA Agreement.

39.     The right to sell the economic interest in the book of business is one of the most significant benefits to the EA, because an EA will often spend years growing a book of business and increasing the value of that book over time and from that book derive compensation.

40.     According to the EA Agreement, an EA may sell an economic interest in a book of business any time, provided Defendant Allstate approves the buyer.

41.     The EA Agreement also states that "[i]n order to be considered for a book purchase, the agent must meet the then current qualifications established by [Allstate]." *See* Manual.

42.     This reference to "then current qualifications" in the EA Agreement gives EAs a reasonable expectation that Allstate will at least consider a potential existing EA buyer of the selling EA's book of business if that existing EA meets the objective qualifications.

43.     But the truth is: Defendant Allstate does not disclose the "then current qualifications" it allegedly uses to evaluate the sale of agencies in Plaintiffs' market – because it does not in fact have uniform qualifications across markets, nor, as in this case, does it always implement those qualifications.

44.     Defendant Allstate's feigned use of qualifications was used, as in this case, to separate exclusive agents, i.e., Plaintiffs, from their economic interest in their agency(ies)'s book of business, thereby allowing Defendant Allstate to reduce costs and absorb the agency's premiums to itself.

45.     Where an EA is unable to sell his or her economic interest, the EA might have the option to receive a small termination payment ("TPP") from Allstate, according to the terms of the EA Agreement, subject to Defendant Allstate's approval. *Id*.

46.     Where Defendant Allstate finds that an EA is unable to find an acceptable buyer and regardless of whether TPP is paid to the EA, Defendant Allstate retains to itself all premiums generated by the book of business.

### Allstate Knows Plaintiffs Are Co-Owners of Their Companies

47.     All preceding paragraphs are incorporated as if fully restated herein.

48.     In 2013 and 2015, Plaintiff James Webb and Kimberly Webb formed the aforementioned corporate entities (Plaintiff Webb Inc. and Plaintiff Webb LLC) as 50-50 owners.

49.     Prior to entering into an EA Agreement with Plaintiff Webb Inc. and Plaintiff Webb LLC, Defendant Allstate received documentation from Plaintiffs identifying and defining Plaintiff James and Kimberly Webb as 50-50 owners of Plaintiff Webb Inc. and Plaintiff Webb LLC, respectively.

50.     Defendant Allstate approved Plaintiffs' 50-50 ownership arrangements, executed EA Agreements with Plaintiff Webb Inc. and Plaintiff Webb LLC, and knew from the inception of these agreements that Plaintiffs were co-owners of the agencies/Plaintiff companies here.

**Defendant Allstate Advises Plaintiffs on How to Work Together, Share Staff**

51.     All preceding paragraphs are incorporated as if fully restated herein.

52.     In 2018 and 2019, Allstate employee Dave Miles held the position of Territory Sales Leader (TSL).

53.     TSLs are employees of Allstate who monitor EA agency sales production within a geographic territory and who have the obligation of enforcing Allstate policies and procedures against EAs when they become aware of EAs violating Allstate policies and procedures.

54.     Plaintiffs reported to TSLs Dave Miles and James R. Turner.

55.     In 2018 and 2019, Plaintiffs consulted with Allstate TSL Dave Miles on how to improve the sales numbers and/or maintain the economic viability of Plaintiff Kimberly Webb's agency.

56.     During in-person meetings and/or phone calls between 2018-2019, inclusive of those years, TSL Miles recommended and approved the following business practices for Plaintiffs:

a.      that James Webb's Licensed Sales Professionals (LSPs) be assigned producer

numbers with Kimberly Webb's agency and be used to assist Kimberly Webb's agency in

quoting the additional sales volume created by marketing Kimberly's agency;

b.      that James Webb stop purchasing leads for his agency;

c.      that James Webb use the money that he would have used for generating leads for

his agency and instead apply that money to buy leads for Kimberly Webb's agency,

including mailing lists, telemarketing, and live transfer leads; and

d.      that James Webb help his wife's agency by quoting new business in his agency

while binding it in Kimberly Webb's agency from time to time.

57.     Plaintiffs followed the above advice, and increased Plaintiff Kimberly Webb's sales.

58.     Field Sales Leaders (FSLs) are employees of Allstate who consult with EAs and monitor

EA agency marketing efforts and sales production within a defined market area.

59.     As part of an FSL's job duties to Defendant Allstate, FSLs enforce Allstate policies and

procedures against EAs who violated those policies and procedures.

60.     Plaintiffs reported to FSL Ivette Frank and FSL Blanca Escudero, as detailed below.

61.     In January of 2020, FSL Frank reviewed Plaintiff James Webb's agency and asked why

his closing ratio was so low.

62.     Plaintiff James Webb tells FSL Frank there were times when he was quoting a prospect

in his agency but binding it in his wife's agency – and Plaintiff James Webb tells FSL Frank that

TSL Dave Miles had approved it each year over the last four years.

63.     FSL Frank took no action to stop Plaintiffs from continuing with this business practice.

**The Investigation**

**Allstate Investigator Interrogates Plaintiff James Webb**

64.     All preceding paragraphs are incorporated as if fully restated herein.

65.     On Friday April 24, 2020, Allstate investigator, attorney Todd Fine, calls Plaintiff James Webb, saying he works for Allstate's Investigative Services team and wants to set time to "talk."

66.     At the time, investigator Fine is also employe by Susan L. Florence & Associates.

67.     On April 27, 2020, Allstate investigator Fine conducts a video (Skype) interrogation of Plaintiff James Webb, in light of an audit that Defendant Allstate did on his business.

68.     During the call Allstate investigator Fine is told:

   a.   that in 2018 and 2019, Allstate TSL Dave Miles encouraged and gave him permission to assist his wife and share staff with her;

   b.   that Allstate TSL Dave Miles approved of Plaintiff James Webb quoting business in his agency and binding it in his wife's agency for at least 2018 and 2019;

   c.   that Plaintiff James Webb and his wife share their income;

   d.   that Plaintiff James Webb and Plaintiff Kimberly Webb co-owned their agencies;

   e.   that in 2018-2019, TSL Dave Miles and FSL Blanca Escudero learned Plaintiffs shared a receptionist and utilized a shared phone system;

   f.   that in 2018-2019, Allstate FSL Blanca Escudero met Plaintiffs together during annual review meetings and approved of the above shared business practices;

   g.   that in 2019, Allstate FSL Mike Lueck learned Plaintiffs shared staff – and celebrated the fact that Plaintiffs' staff sharing practices caused Plaintiff Kimberly Webb to achieve a bonus with Plaintiff James Webb's assistance;

h.  that throughout 2018-2020, Allstate FSL Blanca Escudero learned Plaintiffs' phone system allowed Plaintiff James Webb to answer calls for his wife;

i.  that in 2020, Allstate FSL Ivette Frank learned that Plaintiffs shared staff and quoted and bound business for Kimberly Webb's agency; and

j.  that neither TSL Miles nor FSL Escudero nor FSL Frank nor FSL Lueck ever told Plaintiffs that these above-mentioned business practices were against Allstate policy – they permitted these practices to continue and/or encouraged them.

**Allstate Investigator Interrogates Plaintiff Kimberly Webb**

69.  All preceding paragraphs are incorporated as if fully restated herein.

70.  Allstate Investigator Fine interrogates Plaintiff Kimberly Webb on April 29, 2020, at approximately 3:00 pm, in light of an audit that was done on her agency by Defendant Allstate.

71.  During the call on April 29, 2020, Allstate investigator Fine is told:

a.  that Plaintiff Kimberly Webb is the Secretary for Plaintiff James Webb's agency;

b.  that Plaintiff James Webb sought approval from Allstate TSL Dave Miles to share business practices, share staff, share payment of staff, and allow quoting of business in his agency while binding that business in his wife's agency;

c.  that Plaintiff Kimberly Webb spoke with Allstate FSL Escudero about being injured in 2019 and needing help from her husband to run her agency;

d.  that Plaintiffs separate agencies were treated as one agency by Allstate FSL Escudero who learned Plaintiffs were 50-50 owners of the two agencies here;

e.  that Plaintiff Kimberly Webb told Allstate FSL Escudero that Plaintiff James Webb used his staff to help her bind her leads because of an injury in 2019;

    f.   that Plaintiff Kimberly Webb was never told by any Allstate employee that Plaintiff James Webb could not quote and bind business in her agency;

    g.   that, per Allstate's approval, Plaintiff James Webb's staff had IDs associated with Plaintiff Kimberly Webb's agency, allowing them to sell for her agency; and

    h.   that Plaintiff Kimberly Webb went through Allstate's channels to get her husband's staff appointed to her agency to market, sell, and quote policies for her.

72.    At no point during the interviews of Plaintiffs does Investigator Fine opine or indicate that either Plaintiff James or Kimberly Webb engaged in fraud or any other conduct that would result in a termination of her/their contract(s) with Defendant Allstate.

73.    At the conclusion of both of Plaintiffs' interviews, Allstate Investigator Fine states his role is just to collect information, not to make decisions as to wrongdoing.

**Defendant Allstate Accuses Plaintiffs of Fraud for Engaging in Approved Conduct**

74.    All preceding paragraphs are incorporated as if fully restated herein.

75.    On July 27, 2020, Plaintiff James Webb and Plaintiff Kimberly Webb are on separate calls with separate Allstate employees who say their EA Agreements have been terminated.

76.    Both are told they are terminated for "fraud," in light of the questions they answered during their interrogation by Allstate investigator Fine.

77.    Contemporaneous to the above calls Defendant Allstate issues notices to Plaintiffs indicating Defendant Allstate is terminating their Allstate R3001C Exclusive Agency Agreements immediately, "for reasons that include fraud."

78.    Thus, Defendant Allstate, by and through Investigator Fine and/or other Allstate employees within Investigative Services and/or other Allstate employees at corporate headquarters and/or other Allstate employees, cause Plaintiffs to lose their EA Agreements and

11

millions of dollars when it/they: falsely reported the contents of the statements of Plaintiffs; conducted slanted/improper investigations; labeled Allstate-approved conduct as fraudulent conduct; and created a pretextual basis for the termination of Plaintiffs' EA Agreements.

### Allstate Regional Sales Leader Blocks Sale of Plaintiff James Webb's Agency

79.     All preceding paragraphs are incorporated as if fully restated herein.

80.     On July 28, 2020, EA Rigo Flores offers about $1.5M cash (2 1/2 x income) to buy Plaintiff James Webb's agency and keep his staff; Plaintiff James Webb accepts Flores's offer.

81.     Allstate FSL Escudero tells Plaintiff James Webb that Flores qualifies for the purchase, with only one potential obstacle: whether Flores had made Honor Ring the previous year.

82.     However, Allstate TSL Gross tells Plaintiff James Webb that Allstate waived Honor Ring as a condition to buy an agency.

### Committee Submission and Approval – Then a Denial

83.     All preceding paragraphs are incorporated as if fully restated herein.

84.     On July 29, 2020, Allstate FSL Escudero sends information about the sale of James Webb's agency to a committee within Allstate, who will decide whether or not to approve the sale of James Webb's agency to Flores.

85.     On July 30, 2020, Flores calls Plaintiff James Webb saying, the committee approved the sale, and the deal will be finalized by Allstate Regional Sales Leader (RSL) Brian Viohl.

86.     On August 3, 2020, Flores calls Plaintiff James Webb saying, RSL Viohl rejected Flores' offer to buy his agency.

87.     The reason for the rejection: Brian Viohl personally disliked Plaintiff James Webb and Rigo Flores did not make Honor Ring in 2019 – the very same criteria that Allstate had waived.

88.     This result is consistent with Defendant Allstate's business practices: its employees would often block the sales of agencies for their own personal, financial, or political interests.

**Plaintiffs Sell Their Agencies at a Huge "Fire Sale" Loss**

89.     All preceding paragraphs are incorporated as if fully restated herein.

90.     Because Defendant Allstate terminated Plaintiff James Webb's EA Agreement and leaked the confidential allegation that he was being terminated for fraud, Plaintiff James Webb, facing the threat of bankruptcy, is forced to sell to a buyer who low-balls him.

91.     Thus, Plaintiff James Webb loses millions of dollars from the failed sale to Rigo Flores.

92.     Plaintiff Kimberly Webb is unable to secure a buyer and, facing financial ruin, is forced to accept a termination from Allstate that amounts to just a fraction of the value of her agency.

93.     As a result of Defendant Allstate's misconduct as aforesaid, Plaintiffs lost not less than $5,000,000.00 from the termination of their EA Agreements and the blocked sale to Rigo Flores.

**COUNT I: BREACH OF CONTRACT**

94.     Plaintiffs repeat and reallege Paragraphs 1-93 as if fully set forth herein.

95.     In order to state a cause of action for breach of contract, a plaintiff must plead: (1 the existence of a valid and enforceable contract; (2 performance by the plaintiff; (3 a breach of the subject contract by the defendant; and (4 that the defendant's breach resulted in damages." Slay v. Allstate Corp., 115 N.E.3d 941, 950 (Ill. App. 1st Dist. 2018).

96.     The EA Agreements at issue in this matter are valid and enforceable in whole or in part.

97.     Plaintiffs performed under the terms of the EA Agreements in this case, selling insurance according to the terms of these contracts.

98.     Defendant Allstate breached the EA Agreements in this case by:

    a. terminating Plaintiffs' EA Agreements for engaging in Allstate-approved business conduct;

    b. blocking the sale of James Webb's Agency to Rigo Flores;

    c. interfering in the negotiations between agency buyers to Plaintiffs' agency(ies);

99. Defendant Allstate's breaches, as aforesaid, caused Plaintiffs to lose agencies that they otherwise would have continued to own, operate, and economically benefit from.

100. Defendant Allstate's breaches, as aforesaid, caused Plaintiffs to incur economic losses of not less than $5,000,000.00, including loss of current income, future income, and loss of sale value of their economic interest in their respective book(s) of business.

## COUNT II: BREACH OF IMPLIED COVENANT OF GOOD FAITH, FAIR DEALING
### Allstate-Approved Business Practices

101. Plaintiffs repeat and reallege Paragraphs 1-93 as if fully set forth herein.

102. "Every contract contains an implied covenant of good faith and fair dealing." *Slay v. Allstate Corp.*, 115 N.E.3d 941, 950–51 (Ill. App. 1st Dist. 2018).

103. Defendant Allstate is vested with sole contractual discretion to terminate the EA Agreements in this case for cause.

104. Defendant Allstate exercised its contractual discretion in a manner contrary to the reasonable expectations of the parties, to wit: Per the EA Agreements at issue here, Plaintiffs enjoyed a reasonable expectation that a for-cause termination of their contracts would necessarily exclude conduct and/or business dealings that were *approved* by Defendant Allstate.

105. Plaintiffs' business dealings, as aforesaid, were approved by Defendant Allstate.

106. Defendant Allstate thereafter terminated Plaintiffs' contracts for adopting Allstate-approved business practices.

107.    Defendant Allstate thus materially breached the covenant of good faith and fair dealing implied in the EA Agreements when it terminated said Agreements on the basis that Plaintiffs engaged in business practices that were approved by Allstate.

**Blocking Rigo Flores' Purchase of Plaintiffs' Agency**

108.    Per the EA Agreements in this case, Defendant Allstate had sole contractual discretion to approve or reject a buyer of Plaintiffs' agency(ies).

109.    Allstate, the party vested with discretion under the EA Agreement to approve the sale of Plaintiffs' economic interest, owed Plaintiff a duty to act in good faith in deciding whether to approve the sale of Plaintiffs' economic interest in his/her/their business(es).

110.    Plaintiffs enjoyed a reasonable expectation that Allstate would not arbitrarily or intentionally block the sale of Plaintiffs agency(ies) to a qualified buyer.

111.    Plaintiffs also enjoyed a reasonable expectation that Allstate would approve the sale of Plaintiffs' economic interest in their book(s) of business to a qualified buyer.

112.    Defendant Allstate initially determined Rigo Flores met the relevant criteria and was qualified to buy Plaintiff James Webb's agency in July 2020.

113.    However, after a committee of Allstate employees approved Flores, Defendant Allstate rejected him solely because RSL Brian Viohl personally disliked Plaintiff James Webb.

114.    Regarding the wrongful termination of Plaintiffs' EA Agreements and the blocked sale of Plaintiffs' agency to Rigo Flores, Defendant Allstate took action that was arbitrary, punitive, and otherwise inconsistent with the parties' reasonable expectations under the EA Agreements.

115.    Thus, Defendant Allstate's breached the implied covenant of good faith and fair dealing, as aforesaid, and caused Plaintiffs to incur economic losses of not less than $5,000,000.00,

including loss of current income, future income, and loss of sale value of their economic interest in their respective book(s) of business.

## COUNT III: FRAUD

116.    Plaintiffs repeat and reallege Paragraphs 1-93 as if fully set forth herein.

117.    Defendant Allstate by and through investigator Fine falsely represented to Plaintiffs that it was undertaking a legitimate investigation into Plaintiffs' business practices when, in fact, it had actually planned to operate a sham investigation to injure Plaintiffs with false allegations of wrongdoing.

118.    At the time it made that statement, Defendant Allstate knew or should have known that its representation of a legitimate investigation was false, to wit: it knew it was operating a sham investigation and it knew or should have known there was no evidence to warrant Investigative Services to interrogate Plaintiffs about their business practices – furthermore, Defendant Allstate knew it was not actually investigating Plaintiffs – but rather, it was planning to harm Plaintiffs with a sham investigation designed to eliminate them from the insurance sales work force.

119.    Defendant intended that its false representation of a legitimate investigation would induce Plaintiffs to act, to wit: Defendant intended to motivate Plaintiffs to sit through an interrogation and offer information about their agency(ies) that Allstate otherwise would not have been able to receive and then use that information against Plaintiffs to injure them in its sham investigation.

120.    Plaintiffs justifiably relied on Defendant's representation that it was conducting a legitimate investigation into Plaintiffs' business practices, to wit: Plaintiffs had no knowledge of Defendant's actual plans to harm Plaintiffs with a sham investigation which targeted them for elimination from the insurance sales workforce, and they had no other information to alert them as to the falsehood of the investigation or the statement(s) made about it.

121.    As a result of their reliance on Defendant's false representation that it was conducting a legitimate investigation, Plaintiffs were in fact injured as they were subjected to a sham investigation and baselessly accused of fraud by Defendant who then published its baseless allegations of fraud to the Texas Department of Insurance; they were thus made to suffer humiliation, embarrassment, extreme emotional distress, and economic loss totaling not less than $5,000,000.00.

### COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

122.    Plaintiffs repeat and reallege Paragraphs 1-93 as if fully set forth herein.

123.    Defendant Allstate's conduct was extreme and outrageous, to wit: Defendant utilized a sham investigation to twist Plaintiff's words into false allegations of "fraud," while ignoring Plaintiffs truthful account of getting permission from Allstate employees to engage in Allstate-approved business practices – Defendant then published its false allegations of fraud to the Texas Department of Insurance, and it did all of this in an effort to ruin Plaintiffs' economic livelihood in the insurance sales industry.

124.    Defendant Allstate intended to inflict severe emotional distress upon Plaintiffs and/or knew that there was a high probability that its conduct would do so, to wit:

       a.   Defendant knew that an allegation of fraud could ruin Plaintiffs' ability to hold an insurance license, and thus could ruin Plaintiff's livelihood in insurance sales;

       b.   Plaintiffs told Defendant, via Allstate TSL Miles, that they had fully committed to their agency(s) as their nest egg and future retirement and that they would be financially ruined if their agency income was destroyed; and

    c.    Defendant knew that the loss of Plaintiffs' livelihood and future retirement on the basis of false allegations would be cruel and unjust and likely to cause complete economic ruin to Plaintiffs.

125.    Defendant Allstate sham investigation and false allegations of fraud in fact caused Plaintiffs to suffer severe emotional distress, including but not limited to the following: suicidal ideation, depression, marital strife, sadness, anxiety, and feelings of hopelessness: all resulting in psychological counseling/therapy, and thus justifying the Request for Relief stated below.

### COUNT V: UNJUST ENRICHMENT

126.    Plaintiffs repeat and reallege Paragraphs 1-93 as if fully set forth herein.

127.    A plaintiff is permitted to plead unjust enrichment in addition to breach of contract claims. *See Bureau Service Co. v. King*, 721 N.E.2d 159 (1999).

128.    Although a plaintiff may plead claims alternatively based on express contract and an unjust enrichment, the unjust enrichment claim cannot include allegations of an express contract. *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (2005).

129.    Pleading in the alternative, Plaintiff expressly omits from this Count V *all* allegations of this Complaint except for ¶¶ 5 to 10, ¶¶ 12 to 20, ¶¶ 118 to 122, ¶¶ 127 to 141 and the request for restitution in ¶ 142(a) and the relief sought in ¶ 142(c), (d), (e), and (f), inclusive of same.

130.    Plaintiffs seek restitution from Defendant Allstate because it unjustly benefitted financially – and at Plaintiff's expense – from the weaponization of its Investigative Services team against Plaintiffs in conducting a sham investigation.

131.    Under the guise of a legitimate investigation, Defendant Allstate used employees and/or resources from its Investigative Services team to execute a fraudulent scheme against Plaintiffs, as referenced in ¶¶ 118- 122 above, and incorporated herein.

18

132.    Defendant Allstate's fraudulent scheme consisted of: falsely representing to Plaintiffs, via investigator Todd Fine, that Defendant Allstate was undertaking a legitimate investigation into their business dealings, when in fact it knew or should have known that the investigation was a sham and there was no basis to investigate Plaintiffs, to wit: the audit upon which the bogus investigation was founded had been baselessly initiated to eliminate Plaintiffs from the insurance sales workforce, in order to reduce costs and increase profitability for Defendant Allstate.

133.    Said misrepresentation and scheme was made with the intent to trick Plaintiffs into talking with Allstate investigator Fine, to gather facts from Plaintiffs in a vacuum that it otherwise could not have learned and then use those facts against Plaintiffs to levy false claims of fraud which would then be sent to the Department of Insurance for the State of Texas, so Plaintiffs insurance licenses would be taken from them and/or so they would be ultimately prevented from or hindered in selling insurance (and thus competing against Defendant Allstate) in the State of Texas.

134.    Plaintiffs relied on the aforesaid false representation of a legitimate investigation when they agreed to talk with investigator Fine and relinquish their lawful right to not speak to him.

135.    Plaintiffs relied to their detriment upon the aforesaid false representation, to wit:  but for the misrepresentation of Defendant Allstate, Plaintiffs never would have been contacted by or spoken to investigator Fine and thus never would have been baselessly accused of fraud by Defendant Allstate.

136.    Plaintiffs were in fact deceived by Defendant Allstate into believing that a legitimate investigation was on-going and thus spoke to investigator Fine who collected their statements in a vacuum and gave them to Allstate who misconstrued their statements as evidence of fraud.

137.    Defendant Allstate's fraudulent scheme was intended to eliminate Plaintiffs from the insurance sales workforce, thus returning economic benefits to Defendant Allstate.

138.    Defendant Allstate's fraudulent scheme in fact caused Plaintiffs to lose their agency(ies).

139.    Defendant Allstate then divvied up the policies in Plaintiffs' agency(ies) to existing sales agents for a reduced commission and/or retained the economic benefit of those policies to itself, thereby retaining monies that would have otherwise been paid to Plaintiffs.

140.    Defendant Allstate then placed the monies that would have otherwise been paid to Plaintiffs in interest bearing accounts for its benefit and/or otherwise used those monies in furtherance of its business interests.

141.    Thus, Defendant Allstate unjustly enriched itself from its fraudulent scheme and its retention of the benefits of that scheme violates the fundamental principles of justice, equity, and good conscience, and so it should be made to pay restitution to Plaintiffs in an amount to be determined at trial.

## REQUEST FOR RELIEF

142.    WHEREFORE, Plaintiffs' demand judgment against Defendant Allstate as follows:

(a)    For money damages, in a sum not less than $5,000,000.00;

(b)    For declaratory relief, to wit: declaring that Defendant Allstate breached the EA Agreement by terminating Plaintiffs' EA Agreements for their having engaged in Allstate-approved business conduct; blocking the sale of James Webb's Agency to Rigo Flores; and/or interfering in the negotiations between agency buyers to Plaintiffs' agency(ies); and taking action that was arbitrary, punitive, and/or otherwise inconsistent with the parties' reasonable expectations under the EA Agreements;

(c)    For punitive damages;

(d)     For pre-judgment and post-judgment interest, as provided by law;

(e)     For attorneys' fees, expenses, and costs of this action; and/or

(f)     For all other and further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all claims so triable.

Dated:  May 27, 2022                    Respectfully submitted,

                                        */s/* Mark Hamill
                                        Mark Hamill (IL Bar No. 6275071)
                                        Adam J. Levitt (IL Bar No. 6216433)
                                        **DiCELLO LEVITT GUTZLER LLC**
                                        Ten North Dearborn Street, Sixth Floor
                                        Chicago, Illinois  60602
                                        Tel: (312) 214-7900
                                        Email: mhamill@dicellolevitt.com
                                                 alevitt@dicellolevitt.com

                                        Robert F. DiCello *(Pro Hac Vice Pending)*
                                        Kenneth P. Abbarno (IL Bar No. 6328853)
                                        **DiCELLO LEVITT GUTZLER LLC**
                                        7556 Mentor Avenue
                                        Mentor, Ohio  44060
                                        Tel: (440) 953-8888
                                        Email: rfdicello@dicellolevitt.com
                                                 kabbarno@dicellolevitt.com

                                        ***Counsel for Plaintiffs***